UNITED STATES of America,
Appellee,

v.

James Edward PAYTON, Appellant.

No. 402, Docket 29827.

United States Court of Appeals
Second Circuit.

Argued May 23, 1966.

Decided July 26, 1966.

Friendly, Circuit Judge, dissented.

Grace L. Brodsky, New York City (Anthony F. Marra, Monroe Goldwater, Robert Conrad, New York City, on the brief), for appellant.

Thomas H. Baer, Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty. for Southern Dist. of New York, Michael S. Fawer, New York City, on the brief), for appellee.

Before FRIENDLY, HAYS and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

Appellant James Edward Payton was charged below with selling cocaine on two occasions in October 1963 in violation of 26 U.S.C. §§ 4705(a), 7237(b). After a trial without a jury, Judge Murphy found appellant guilty on both counts of the indictment. On appeal, Payton claims that (1) his prearraignment statement should not have been received into evidence and (2) the indictment should have been dismissed because the grand jury was not told it was hearing hearsay evidence. For reasons given below, we affirm.

Since no claim is made of failure of proof, we need recount the facts only briefly. The evidence of the government's witnesses was that Payton sold an ounce of cocaine to undercover Agent Cockerille on October 3, 1963 and again on October 10, 1963. The price for each purchase was $600. Between twelve noon and 1:00 P.M. on November 20, 1963, Cockerille and another agent arrested appellant at his room at 307 West 79 Street in Manhattan. On the way to the Bureau of Narcotics office at 90 Church Street, Cockerille advised Payton that he did not have to make a statement and that he could wait until he had an attorney. Nevertheless, Payton "grabbed at the opportunity" to become an informer. Payton then told Cockerille the name of the supplier of the narcotics. At 90 Church Street, appellant was fingerprinted and photographed; thereafter, he was brought to the United States Court House at Foley Square, and at about 2:40 P.M. an assistant United States attorney interviewed him in the presence of the two agents. At that time, Payton was advised that he did not have to answer any questions and that any answers could be used against him. Thereafter, appellant answered questions and admitted the two sales of cocaine. Appellant was arraigned immediately thereafter. The transcribed questions and answers comprise the written statement that is the basis of Payton's first claim on appeal.

Appellant argues that receipt of the written statement by the trial court without a finding that appellant had been informed of his constitutional right to counsel and had voluntarily waived that right was error. Appellant relies on *Escobedo v. State of Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), as he may, since his trial began in September 1964, after the decision in *Escobedo*. See Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). The manner in which the written statement was used at trial is significant. It was not offered by the government in its direct case; however, Cockerille related his conversation with Payton on the way to the Bureau of Narcotics immediately after arrest, and also the substance of Payton's later admissions to the assistant United States attorney, which were reduced to writing in the statement. There was no objection to Cockerille's testimony upon *Escobedo* grounds. The written statement was first used by the government in cross-examining Payton (who denied giving the answers attributed to him) and it was at that point that the objection now pressed was first made. On redirect examination of Payton, he claimed that he had asked Cockerille several times for permission to call his cousin to obtain a lawyer, but had been told that it was not necessary. Cockerille, in rebuttal, denied any such requests were made; this was corroborated by the testimony of the assistant United States attorney. Judge Murphy specifically resolved this issue of credibility and stated that he did not "accept the testimony of * * * [Payton] with regard to his mentioning a lawyer," because he believed that Payton was eager to cooperate.

Against this factual background, Payton's argument that admission of the statement requires reversal of the conviction is without merit. Cockerille did advise appellant of his right to counsel and his right to remain silent. While the assistant United States attorney only repeated the latter, this would not render the prior warning insignificant. Appellant did not request counsel, and the questioning was fair and non-coercive. Under United States v. Cone, 354 F.2d 119 (2d Cir. 1965) (en banc), cert. denied, 384 U.S. 1023, 86 S.Ct. 1958, 16 L.Ed.2d 1026 (1966), the statement was voluntary and its admission into evidence was not error. It is true that under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), a broader and more detailed warning to appellant would now be required, but that holding applies only to trials that had not begun "as of June 13, 1966," Johnson v. New Jersey, supra, at 734, 86 S.Ct. at 1772. In this context, the claim that Judge Murphy should have specifically found that Cockerille did advise Payton of his right to counsel and that Payton had waived it is not weighty. There was no request for a special finding and, in any event, it is clear that Judge Murphy in this non-jury case accepted Cockerille's testimony and rejected Payton's version of the facts. Appellant also claims that the judge erred in not holding a *voir dire* on the voluntariness of the statement. However, the circumstances surrounding the giving of the statement were explored in the trial court; even now, appellant points to no exclusion of evidence tending to negate voluntariness. Since the court found that the statement was made in a spirit of cooperation, there is no doubt that the issue was considered and resolved. An additional desultory argument is made based on Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L. Ed.2d 1479 (1957), but no objection on this ground was made below. United States v. Indiviglio, 352 F.2d 276 (2d Cir. 1965) (en banc), cert. denied, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966); United States v. Percodani, 363 F.2d 867 (2d Cir. 1966) (per curiam). Finally, receipt of the statement was, at most, cumulative and, therefore, harmless error, if error at all. Cockerille, without objection on this ground, testified to the substance of Payton's admissions well before the written statement was admitted into evidence. Under all of the circumstances, including the overwhelming evidence of appellant's guilt in this non-jury trial, we do not find reversible error in admission of the statement.

Appellant also claims a denial of due process because the grand jury that indicted him was not informed that testimony it heard was hearsay. The only witness who appeared before the grand jury was Agent Ward, whose testimony at trial related only to surveillance activities. He testified at trial that he did not see Cockerille give any money to appellant or appellant give anything to Cockerille and that he did not hear any conversation involving Payton on any of the crucial dates. However, before the grand jury Ward related conversations, which he had never heard, between Cockerille and Payton. The government argues that the grand jury knew that Agent Ward was describing the acts of other agents and therefore was, in effect, advised that it was hearing hearsay. However, it is fair to say that this does not emerge from the transcript of Ward's grand jury testimony, although at trial Ward stated that the grand jury was told that he was answering questions based "upon reports that had been furnished to me." Appellant accepts the rule of Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956), that an indictment may be based solely on hearsay, but argues that the grand jury is misled if it does not know it is hearing hearsay. Moreover, he claims that the failure to advise the grand jury that the witness is in fact testifying only on the basis of hearsay is a prosecutorial "practice" in this circuit designed to circumvent defendant's rights; this is allegedly accomplished by withholding from the grand jury witnesses whose testimony there might afford the basis for impeachment of their later testimony at trial.

■ As to the alleged misleading of the grand jury, the facts presented to the grand jury were, of course, those later offered at trial primarily through other witnesses and presumably found true by Judge Murphy. Therefore, there was no misleading in that sense. Appellant does not claim that Ward affirmatively misstated to the grand jury that he was testifying from his own personal knowledge; the transcript does not support such a claim, but it does support the claim that the jury was not told it was hearing hearsay and may have believed that it was not (although as to that, we do not know). Ward's statement at trial indicates that he thought the grand jury knew he was recounting what other agents had reported; and for all we know, his visual reference to reports in his hands, when testifying before the grand jury, might have made that fact clear. However, we agree, as the dissent points out, that this is speculation. What we are left with, in any event, is appellant's proposition that the prosecutor, or the witness presented by the government, has an affirmative duty to tell the grand jury it is listening to hearsay, and failure to do so calls for dismissal of the indictment. This is a drastic remedy for conduct not shown to be deceitful. No case cited to us so holds; nor do we see how such a holding could be justified in the face of Costello v. United States, supra. While this precise point was not there raised, the tenor of that opinion does not suggest that further general rules, to be enforced by the sanction of dismissal, should be imposed on the manner of presenting evidence to the grand jury—at least in the absence of intentional misstatement. See also Lawn v. United States, 355 U.S. 339, 348–350, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958).

■ Appellant also contends that the absence of the general rule he seeks allows the prosecutor to deny him rights to which he is entitled. There is no doubt that under proper circumstances, defendants are allowed access to grand jury minutes for the purpose of pointing out inconsistencies with trial testimony, Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966), and cases cited in id. n. 21, and there is no possibility of doing this with a trial witness who did not testify before the grand jury. However, appellant has taken a rule of access formulated to expose inconsistencies and has turned it upside down to prove a requirement that a witness appear before a grand jury so that an inconsistency may be created. This argument is a non sequitur. We will continue to hold, of course, that a defendant may prove inconsistencies at trial with prior statements to a grand jury; we do not hold that a defendant may require prior statements to a grand jury simply to create inconsistencies at trial. We surmise that defendant's real claim is that there is insufficient discovery in criminal cases, a position in which he is clearly not alone.[1] But that problem should be met on its own terms, not by the method he seeks here.

Judgment affirmed.

FRIENDLY, Circuit Judge (dissenting):

The course followed by the Government in this case makes a mockery of the Fifth Amendment's guarantee that "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." What compromises this indictment is not that the grand jury heard only hearsay testimony as in Costello v. United States, 350 U.S. 359, 76 S.Ct. 406 (1956), but that, in sharp contrast to that case, it had no way of knowing that the testimony which was all it was hearing was hearsay. Despite the lame apology offered at trial by Agent Ward, his statements to the grand jury, recorded in the transcript annexed to this opinion, were the words of a man who had seen or heard whereof he spoke and were plainly meant to be taken as such; the Government does not contend anything

---

1. See authorities cited in Advisory Committee's Note to Rule 16, Proposed Amendments to Rules of Criminal Procedure for the United States District Courts (1966 Amendments).

was said to the grand jury before Ward was sworn that would have apprised it of his limited knowledge. Even if Ward had been looking at reports while in the grand jury room, as my brothers choose to speculate, the jurors would have thought he was refreshing his recollection of events to which he was testifying as within his own knowledge rather than reading what Cockerille had reported to him. It is plain that had any such deception occurred at trial, whether through or without design, it would not be countenanced. See Pyle v. State of Kansas, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942); Curran v. State of Delaware, 259 F.2d 707 (3 Cir. 1958), cert. denied, 358 U.S. 948, 79 S.Ct. 355, 3 L.Ed.2d 353 (1959); Kyle v. United States, 297 F.2d 507 (2 Cir. 1961).

If, in these narcotics peddling cases, the Government insists on pressing *Costello* to the point of offering a grand jury only hearsay testimony by a surveilling agent when there is no apparent reason save a transparently unworthy one [1] for not producing the agent with firsthand knowledge, it must make clear to the jurors the shoddy merchandise they are getting so they can seek something better if they wish; thus pressing the prosecutor for more reliable evidence—particularly important in these narcotics prosecutions where there is often a problem of the reliability of an agent's identification—is the grand jury's historic function. In the *Costello* case there was excellent reason for limiting the presentation to the three agents who summarized financial evidence, proof of which required 141 other witnesses and 368 exhibits at the trial, and the agents' lack of direct knowledge must have been apparent. The statement in Mr. Justice Black's opinion,

"An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits", 350 U.S. at 363, 76 S.Ct. at 409, could never have been meant to validate anything like what happened here; on the contrary I am convinced that if *Costello* had presented facts like these, the Court would have dismissed the indictment on the ground, stated by Mr. Justice Burton, that "[t]o hold a person to answer to such an empty indictment for a capital or otherwise infamous federal crime robs the Fifth Amendment of much of its protective value to the private citizen." 350 U.S. at 364, 76 S.Ct. at 409 (concurring opinion). Fully recognizing the undesirability of a practice whereby "before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury," 350 U.S. at 363, 76 S.Ct. at 409, I nevertheless think a proper respect for the constitutional requirement of indictment and the "high place" held by the grand jury "as an instrument of justice," 350 U.S. at 362, 76 S.Ct. 406, forbids our sanctioning what happened in this case. When it becomes clear in the course of trial that the evidence on which the grand jury indicted was entirely hearsay, the Government must at least satisfy the court that the grand jurors knew this was all they were hearing. The Government did not do that here; Ward's trial testimony that he had told the grand jury he was answering "upon reports that had been furnished" him cannot overcome the record that he said nothing of the kind.

I would reverse and direct dismissal of the indictment.

---

[1]. In United States v. Borelli, 336 F.2d 376, 391–392 (2 Cir. 1964), cert. denied, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965), another prosecution in the Southern District of New York, we noted that the Government had withheld its principal witness, an accomplice, from the grand jury and had presented his evidence through a narcotics agent who had interviewed him. However, apart from a possible distinction between an accomplice and a government agent, the grand jury in that case knew precisely what it was hearing.

## APPENDIX

John J. Ward, called as a witness, having been duly sworn by the Deputy Foreman, testified as follows:

*By Mr. Gold:*

Q. Will you state your name, please. A. John J. Ward.

Q. And your occupation? A. I'm a Narcotic agent with the Federal Bureau of Narcotics.

Q. Now, are you familiar with the investigation surrounding the defendant, James Edward Payton [spells]? A. Yes sir, I am.

Q. Now, I direct your attention to October 3rd, 1963, and on that day did an agent of the Bureau of Narcotics meet with the defendant? A. Yes sir, he did.

Q. Who was that agent? A. Agent James Cockerille.

Q. And where did this meeting take place? A. It took place at the La Salle Bar, 90th Street and Amsterdam Avenue.

Q. And was the agent introduced to the defendant by an informant? A. Yes sir.

Q. What was the conversation? A. The conversation was that Agent Cockerille told the defendant, Payton, that he was interested in purchasing one ounce of cocaine. The defendant, Payton, said he would sell it to him for approximately six hundred dollars. At this particular time Agent Cockerille then counted out six hundred dollars, official Government funds. The defendant, Payton, took the money, told him to wait there and that he would return with the cocaine. He then left the bar and proceeded back at approximately 10:00 P.M. of the same evening. When he returned to the bar, he handed Agent Cockerille a tinfoil package which contained cocaine.

Q. Was this package analyzed by the United States Chemist? A. Yes sir, it was.

Q. And he found it to contain cocaine hydrochloride? A. Yes sir.

Q. Was the total weight nineteen grams one hundred milligrams? A. Yes sir, it was.

Q. Now, during this transaction was there any order form used by anyone? A. No sir.

Q. Was there any conversation about any order blank? A. No sir.

Q. And in a sale of a narcotic drug is an order form supplied by the Secretary of the Treasury or his delegate required? A. Yes sir.

Q. Directing your attention to October 10, 1963, did the undercover agent again meet with the defendant on that date? A. Yes sir.

Q. Where did the meeting take place? A. The La Salle Bar at 90th Street and Amsterdam Avenue.

Q. Did they have a conversation? A. Yes sir. Agent Cockerille told him again he was interested in purchasing another ounce of cocaine. The defendant said he would sell it to him for the same price—approximately six hundred dollars.

Q. Exactly six hundred dollars? A. Yes sir. At that particular time Payton requested the six hundred dollars. Agent Cockerille counted out six hundred dollars, official funds, and gave it to Payton. Payton told him to wait at the Blue Rose Bar at 85th Street and Amsterdam Avenue. He told him to wait there and he would return with the cocaine. Approximately 2:00 A.M. the next morning, on October 11, Payton returned to the Blue Rose Bar. At this particular time he handed Agent Cockerille a tinfoil package which contained cocaine.

Q. And this was analyzed and found to contain cocaine hydrochloride by the United States Chemist? A. Yes sir.

Q. And he found the total weight to be twenty grams, five hundred milligrams, is that correct? A. He certainly did.

Q. During this transaction was there any order form requested by anyone? A. No sir.

Q. Did any person use any order form in any manner during any of this transaction? A. No sir.

Q. Was there any conversation of any kind about any order form? A. No sir.

Q. I have nothing further.